## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Thomas L. Kapp, being duly sworn, depose and state as follows:

## BACKGROUND OF AFFIANT

1.        I am a special agent with the Federal Bureau of Investigation ("FBI") and have been so employed since 2004. My experience as an FBI special agent has included the investigation of federal offenses related to terrorism, violent crimes against children, and counterintelligence matters. From 2008 to 2010 and starting again in 2022, I have been assigned to investigate human trafficking, underage prostitution, and crimes against children, and I have participated in multiple investigations involving child exploitation, trafficking of child pornography, and online enticement of minors. I received training and have experience in, among other things, conducting interviews, making arrests, applying for and executing search warrants, and seizing and reviewing electronically stored evidence. I am a federal law enforcement officer who is engaged in enforcing federal criminal laws, and I am authorized by the Attorney General to request search and arrest warrants.

2.        I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

3.        I am currently investigating Michael W. Landon ("Landon"), who, at the time of the offense conduct under investigation, resided in Mystic, Connecticut, for producing child pornography, in violation of 18 U.S.C. § 2251, knowingly distributing child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2) and (b)(1), as well as possessing and accessing with intent

to view child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) (collectively, the "TARGET OFFENSES").

4.      I submit this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following Apple iPhones (collectively, the "TARGET DEVICES") that are currently in the custody of the Town of Groton Police Department and their Digital Forensics Laboratory, which is located at 68 Groton Long Point Road in Groton, Connecticut:

      a.      a Blue Apple iPhone 13, serial number J26KYTR666 ("TARGET DEVICE 1"); and

      b.      a Pink Apple iPhone 7 Plus, serial number F2LT56TKHG07 ("TARGET DEVICE 2").

5.      Based on the information contained in this Affidavit, there is probable cause to believe that the TARGET DEVICES, which are more specifically described in Attachment A, contain contraband, evidence, fruits, and instrumentalities of violations of the TARGET OFFENSES, as more specifically described in Attachment B.

## STATUTORY AUTHORITY

6.      Each of the TARGET OFFENSES are set forth here:

      a.      Title 18, United States Code, Section 2251 prohibits a person from producing child pornography "if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed."

      b.      Title 18, United States Code, Sections 2252A(a)(2) and (b)(1) prohibit a person from knowingly receiving or distributing, or attempting or conspiring to receive or distribute, any child pornography or any material

that contains child pornography, as defined in 18 U.S.C. § 2256(8), using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

c.      Title 18, United States Code, Sections 2252A(a)(5)(B) and (b)(2) prohibit a person from knowingly possessing or knowingly accessing with intent to view, or attempting or conspiring to do so, any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

7.      The statements contained in this Affidavit are based in part on information provided by other members of local, state, and federal law enforcement, my own participation in this investigation, my review of documents and other investigative materials, and my training and experience as an FBI special agent. Because this Affidavit is being submitted for the limited purpose of obtaining a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband, evidence, fruits, and instrumentalities of commission of the TARGET OFFENSES are located on the TARGET DEVICES.

## GENERAL DEFINITIONS

8.      The following definitions apply to this Affidavit:

a.      "Minor," as used herein, is defined by 18 U.S.C. § 2256(1) to mean "any person under the age of eighteen years."

b.      "Child Pornography" is defined by 18 U.S.C. § 2256(8) to mean "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where—(A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is a digital image, computer image, or computer-generated

3

image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct."

c.     "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones as well as mobile phones and devices. *See* 18 U.S.C. § 1030(e)(1).

d.     "Visual depiction" includes "undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format." 18 U.S.C. § 2256(5).

e.     "Sexually explicit conduct" means "actual or simulated-- (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the anus, genitals, or pubic area of any person." 18 U.S.C. § 2256(2)(A).

f.     "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

g.     "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alphanumeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data

security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore.

h.  "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. Traditionally, IP addresses were either dynamic, meaning an Internet service provider ("ISP") assigns a different unique number to a computer every time it accesses the Internet, or static, meaning an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. Generally, the static IP addresses were assigned by those companies who offered "broadband" Internet service, such as through cable or digital subscriber line ("DSL"), whereas "dial up" companies would assign their users dynamic addresses. Now, however, as a greater number of American Internet users choose broadband Internet service, many of these users are being assigned what may be colloquially referred to as a "sticky dynamic IP address" or a "sticky IP." A sticky IP is a dynamically assigned IP address that does not change often. The address leases are usually set to long periods and simply renewed upon expiration. The practical effect is that one may observe a user being assigned the same IP address for weeks or months and then assigned another IP address for a similar stretch of time.

i.  "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

## BACKGROUND OF PROTON MAIL & WICKR

9.  As discussed more fully below, the investigation began after the FBI discovered several videos of voyeuristic child nudity uploaded to Wickr by a user with the following email address as the username: mlandino86@protonmail.com (hereinafter "mlandino86").

10.  Based on my training and experience, I know that Proton Mail is a private, secure, and encrypted email service.

11.  Based on my training and experience, I know that Wickr is an instant messenger application that allows users to exchange end-to-end encrypted and content-expiring messages. Wickr also has "rooms," which are private chat groups between users. I also know that Apple

iPhones are capable of connecting to applications, such as Wickr. In response to legal process, Wickr does not provide IP addresses, phone numbers, recovery emails, or other basic subscriber information. Accordingly, law enforcement must employ alternative investigative methods to determine the actual identity of a Wickr user. Wickr users can use an email address as a username if the user opts for that tier of Wickr service.

## SUMMARY OF INVESTIGATION

12.     In August 2022, the FBI Albany Field Office arrested an individual who had wide access to several child pornography trading rooms within Wickr. This individual agreed to allow the FBI to assume the individual's Wickr identity. Upon receiving consent, an FBI Online Covert Employee ("OCE") began operating the individual's Wickr account.

13.     On or about March 29, 2023, the OCE was present in a Wickr child pornography trading room dedicated to spycams and voyeurism. The nature and content of the room was to trade child pornography that was obtained through surreptitious means, such as a hidden spycam. A Wickr user ("User 1") distributed a child pornography video file, named "2022_04_12_21[redacted].mp4"[1], in the trading room that depicted a young pubescent female child ("Victim 1") using the bathroom who, based on this investigation and as described below, appears to be an actual 14-year-old female child.[2] The video was captured by what appeared to be a hidden camera in the bathroom. In the video, which I have also reviewed, Victim 1 is mostly nude, with her breasts and the front of her genitalia exposed.

14.     User 1, who distributed the video, asked, "Whatever happened to that one guy who was filming ▮▮▮▮▮▮▮▮▮▮▮▮ " User 1 had distributed the video described in Paragraph

---

[1] Throughout this Affidavit, the full video file names are partially redacted. One reason to redact the file name is to protect them from being searched by the file name itself. The full video names are known to your affiant.
[2] Victim 1's date of birth is ▮▮▮▮▮ 2009.

13 in the trading room to show which girl he was talking about. The mention of the term ▮▮▮▮▮▮ likely referred to the female's ▮▮▮▮▮▮▮ which is visible in the video. A separate Wickr user ("User 2") posted that he knew the individual who captured the video. The OCE then initiated a direct message conversation with User 2 who responded that the person who captured the ▮▮▮▮ video" was user mlandino86.

15. As part of this investigation, the OCE also examined files and file folders found within child pornography trading rooms dedicated to spycams and voyeurism on Wickr. The rooms contained saved file folders that allowed Wickr users to view child pornography that had been posted in the past if the child pornography media was saved to the Wickr room. Within the saved files folder of one Wickr room, called "SPyglass", the OCE observed several video files uploaded by user mlandino86 that showed Victim 1. Most of the videos were captured in the same bathroom. There was an additional video, described below in Paragraph 16(f), that displayed Victim 1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in a living room. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16. I reviewed the following videos that were uploaded by user mlandino86 and saved on the Wickr platform. All videos depict Victim 1.

    a. "2022_04_10_21[redacted].mp4" was uploaded to the "SPyglass" Wickr chatroom on or about May 9, 2022. It is approximately 60 seconds in length. The video appears to be taken from a camera that is on a bathroom sink and shows Victim 1 walk into the bathroom topless and sit down on a toilet. When Victim 1 stands up, you can see her pubic hair as she wipes her genitalia with toilet paper.

    b. "2022_03_30[redacted].mp4" was uploaded to the "SPyglass" Wickr chatroom on or about May 9, 2022. It is approximately twelve minutes and 38 seconds in length. The video appears to be taken from a camera that is on a bathroom sink and shows Victim 1 walk into the bathroom, use the toilet, take off her clothes, and enter the shower. As she exits the shower,

you can see her breasts and genitalia while she uses a towel to dry herself off.

c. "2022_05_12[redacted]" was uploaded to the "SPyglass" Wickr chatroom on or about May 12, 2022. It is approximately 77 seconds in length. The video appears to be taken from a camera that is on a bathroom sink and shows Victim 1 sitting on the toilet before she stands up with her pubic hair exposed.

d. "2022_05_17[redacted]" was uploaded to the "SPyglass" Wickr chatroom on or about May 17, 2022. It is approximately 71 seconds in length. The video appears to be taken from a camera that is on a bathroom sink and shows Victim 1 turning on the bathroom light and walking in to use the toilet. When she stands up, you can see her breasts and genitalia.

e. "2022_05_26[redacted]" was uploaded to the "SPyglass" Wickr chatroom on or about May 26, 2022. It is approximately 92 seconds in length. The video appears to be taken from a camera that is on a bathroom sink and shows Victim 1 walk in to use the toilet and unzip her robe. As she stands up and turns toward the camera, her breasts and genitalia are exposed.

f. "IMG_84[redacted].MOV" was uploaded to the "SPyglass" Wickr chatroom on or about May 29, 2022. It is approximately 13 seconds in length. The video appears to be taken from a mobile phone camera in a living room and shows Victim 1 standing ▓▓▓▓▓▓▓ with a shirt and underwear on. There is an adult female ▓▓▓▓▓▓▓▓▓▓▓ Victim 1 bends over and ▓▓▓▓▓▓▓▓▓▓ while the camera focuses on her bending over in her underwear. ▓▓▓▓▓▓

g. "2022_06_07[redacted]" was uploaded to the "Spyglass" Wickr chatroom on or about June 7, 2022. It is approximately 13 minutes and eleven seconds in length. The video appears to be taken from a camera that is on a bathroom sink and shows Victim 1 standing in the shower, drying off, and then standing in front of the bathroom mirror topless, exposing her breasts.

17.	On or about March 31, 2023, the OCE engaged in a direct message conversation with mlandino86 using Wickr. The OCE stated, "hey there – wanted to say I'm a fan of ▓▓▓ ▓▓▓▓" to which mlandino86 replied, "Thx. I like her too."

18.     On or about April 2, 2023, the OCE observed mlandino86 distribute another video to a separate Wickr child pornography group named "share ███████████" The video is named "2023_04_02[redacted].mp4" and was uploaded to the chatroom on April 2, 2023. The video is approximately 73 seconds in length. The video, which I have reviewed, appears to be taken from a camera underneath a desk in a bedroom. Victim 1 can be seen standing up from the desk and undressing. She wipes her genitalia with a towel as the camera angle shows her bare buttocks. She then proceeds to change her underwear.

### Prior Investigation by United Kingdom

19.     Prior to the current investigation, United Kingdom ("UK") law enforcement investigated Wickr user mlandino86 for child pornography trading activity. UK law enforcement obtained basic subscriber information for a MEGA account with a registered email address of mlandino86. MEGA is an online cloud-sharing platform that is popular in the child pornography trading community. Included in the MEGA basic subscriber information was an IPv6 IP address. The IP address resolved to Comcast Cable Communications, LLC, which is an American telecommunications business, with the subscriber's geolocation of Groton, Connecticut.

### Open-Source Research and Referral to Town of Groton Police Department

20.     The FBI Albany Field Office performed an open-source Facebook search for users with derivations of the name "mlandino" residing in Groton, CT. The results of the search revealed a Facebook user, Michael Landon, residing in Groton, CT. The Facebook profile for Landon included pictures of ███████████████████████████████████ as depicted in the spycam videos uploaded to Wickr by user mlandino86. There was also a picture of a ████ ██████████ on Landon's Facebook account that matche ███████████████████████ ████████████████████████. Finally, the pictures on the Facebook profile demonstrated

that Landon appeared ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

21.     A DMV and criminal history check was performed on Landon, and it returned a Michael Landon, with a year of birth of 1986, residing in Mystic, CT. Landon's birth year of 1986 is consistent with the last two digits of the first part of his Wickr username, mlandino86. The DMV picture of Michael Landon matched the Facebook profile picture for user Michael Landon.

22.     On or about April 4, 2023, Detective Savino went to the Mystic address and observed a maroon Hyundai Elantra parked in front of the residence. On or about August 12, 2022, this vehicle also was present in police Body Worn Camera ("BWC") footage during a Town of Groton Police service call at Landon's previous residence in Groton, Connecticut on or about August 12, 2022. Detective Savino located another incident in Groton Police records from June 6, 2022, in which officers responded to an incident regarding a young female at ████████ ████ Detective Savino reviewed the BWC video from the June 6, 2022, incident and observed officers speaking with a young female. Detective Savino positively identified this female to be Victim 1 depicted in the voyeuristic child nudity videos posted by Landon's Wickr profile.

23.     On or about April 4, 2023, members of the Town of Groton Police Department, including Detective Hammerstrom, Detective Comeau, Detective Savino, and Investigator Robertson arrived at Landon's residence in Mystic, Connecticut. When no one answered the door, Detective Savino called and texted ████████████ ("Witness 1"). She called back a few

minutes later. Detective Savino asked Witness 1 if she could meet the officers at her residence to discuss an issue pertaining to ████████ Victim 1. She agreed and arrived ten minutes later.

24.     Detective Savino explained to Witness 1 that voyeuristic videos of Victim 1 were shared on the internet. Detective Savino first asked Witness 1 to identify the locations depicted in screenshots that he had printed from several of the videos described in Paragraph 16 above. Detective Savino showed Witness 1 a printed screenshot from video "IMG_84[redacted].MOV" that did not depict Victim 1. Witness 1 recognized herself with ████████████ in the screenshot from "IMG_84[redacted].MOV". Witness 1 explained that the screenshot showed her living room ██████████████████████████. She pointed to herself and said, "That's me". Detective Savino asked whose knee was in the picture. Witness 1 replied that it must be "Michael's". Detective Savino then showed Witness 1 an uncropped screenshot from the same video, and Witness 1 identified Victim 1 ██████████. The metadata associated with "IMG_84[redacted].MOV" indicates a "tagged date" and "encoded date" of May 26, 2022, at 2311 hours UTC or 1711 Eastern Time. The geographic coordinates of this recording are within a few hundred feet of ██████████████████████, and Witness 1 confirmed that this video showed the living room at that address.

25.     Detective Savino showed Witness 1 the printed screenshot from video "2022_04_12[redacted].mp4" that was recorded in a bathroom. Witness 1 identified the bathroom ████████████████████████ The video shows Victim 1 topless, pulling her pants down, and using the toilet. The file name indicates that the video was recorded and/or saved on or about April 12, 2022, at 2158 hours UTC. Witness 1 confirmed that on that date, ████████████████████████████████

26. Detective Savino showed Witness 1 the screenshot from video "2023_04_02[redacted].mp4" that was recorded in a bedroom. Witness 1 identified the bedroom ███████████████████████████████████ This was the most recent known voyeuristic video of Victim 1 posted to Wickr on April 2, 2023. The recorded date was reflected in the file name (*i.e.*, 2023_04_02). Detective Savino explained to Witness 1 that he was concerned there were hidden cameras in her home ████████████████████████████████. Detective Savino asked Witness 1 if she would escort them into her home to search for hidden cameras. At or around 10:38 a.m. on April 4, 2023, Witness 1 agreed and signed a Town of Groton Police Department Consent to Search and Examine Evidence form.

27. ████████████████████████████████████████



████████████████████████████████████████. ███████████ the residence has three bedrooms, a living room, a kitchen, one common bathroom, and a master bathroom. ███████████████████████████████████████████

28. Upon entering the residence, Detective Savino observed an exterior security camera above the front doorway. The living room is immediately inside the front entrance. There was an indoor security camera in the living room. Detective Savino asked Witness 1 for permission to unplug it. Detective Savino unplugged the camera for privacy while speaking to Witness 1. Detectives searched the home for hidden cameras. Witness 1 remained informed and aware of where the detectives were searching. The detectives did not locate a camera in the bathroom.

29. Upon entering ███████ bedroom down the hallway and to the left, Detective Savino immediately recognized the furniture, the closet doors, and other items in the room as they appeared in the video titled "2023_04_02[redacted].mp4" that user mlandino86 had shared

on Wickr on or about April 2, 2023. Detective Savino observed ██████████████████ ███████████████████████████████. Detective Comeau and Detective Savino searched the area under the desk for a camera, which was the approximate viewing angle of the video. There was a black wireless phone charger on the floor next to the desk. The charger consisted of an upright charging pad attached to a base. Detective Savino observed that the base of the charger was slightly larger than a normal charger and was made of a shiny plastic material.

30.     At or around 10:55 a.m., Detective Savino picked up the wireless phone charger and observed a removable cover on the bottom. Detective Savino removed the cover and observed a micro SDXC card inserted in a micro-SD card slot. A micro-SDXC card is a very small flash memory card that has greater storage capacity than regular micro-SD cards. These cards are commonly used in small devices, such as cameras and cell phones to store data of all types. Detective Savino unplugged the charger and shined his flashlight at the shiny plastic material in the front of the base. Detective Savino could see a camera lens concealed behind the tinted plastic. The height and direction of this camera lens while it rested on the floor was consistent with the viewing angle of the video titled "2023_04_02[reacted].mp4". Detective Savino showed Witness 1 the phone charger and revealed that it was, in fact, a hidden spy camera. Witness 1 said that Landon bought it ███████████ Witness 1 believed it ████████ ███████████████████████████████████████████.

31.     Detective Savino asked Witness 1 if she would allow him to examine the data on the SDXC card from the spy camera. At or around 11:00 a.m., Witness 1 agreed and signed a Town of Groton Police Department Consent to Search and Examine Evidence form. Detective Savino seized the phone charger spy camera and tagged it as evidence. At about 11:40 a.m.,

while at the Town of Groton Police Department, Detective Savino completed a forensic examination of the SDXC card. It did not contain any content.

32.     After discovering that there were no files saved to the SDXC card, Detective Savino researched this spy camera to learn about its functionality. Detective Savino found what appeared to be the same spy camera on Amazon.com. It was titled, "Spy Camera Hidden Camera WiFi Wireless Phone Charger with Video, Motion Activated, Nanny Cam HD 4k (Rotate Lens) with 250 degree Viewing Angle, cameras espias ocultas for Home Office Security (2.4.5G)." This model operated as a WiFi connected camera with live-view capability from an iPhone or Android smart phone application. The camera has a motion activation function that sends an alert to a smart phone when it detects motion and then it starts recording.

33.     Based on this information, law enforcement believed that videos captured by the spy camera would have been transmitted to Landon's phone and/or to an application on Landon's phone.

34.     On or about April 4, 2023, at about 11:30 a.m., Groton detectives called Landon's cell phone and asked him to come to the headquarters for an interview. At around 11:47 a.m., Landon arrived at police headquarters. He did not have his cell phone with him. Detective Comeau and Detective Hammerstrom brought Landon to an audio- and video-recorded interview room. Once in the room, Detective Hammerstrom advised Landon that the interview would be video recorded; he closed the door for privacy, but he did not lock it. Detective Hammerstrom told Landon that he was free to leave at any time for any reason and that he was not under arrest or being detained.

35.     During the interview, Landon provided the following information. Witness 1 had contacted Landon prior to coming to police headquarters. Landon knew the investigation had to

do with hidden cameras ████ and possibly sharing the videos online. Landon denied any knowledge about the hidden cameras or sharing the videos online. When questioned about the phone charger that contained a hidden camera found i ████ bedroom, Landon said he recently bought ████ charger. The charger was recommended to him as a good charger, but he did not know it contained a camera. The person that recommended the charger had emailed Landon and gave him a gift card to help purchase it. Landon said the camera may have been hacked. Landon further explained that when he plugged the charger in to make sure it worked, he also charged his phone. When he did this, the charger made a noise, and Landon stated, "maybe it aligned the charger to the phone." He bought the charger a couple of months ago and could not remember if it was when ████████████████ ████ .

36. Detective Hammerstrom asked Landon if it (*i.e.*, recording the victim) was a mistake or a "money-making thing." Landon shook his head, indicating no. Detective Hammerstrom asked Landon what it is then. Landon looked at the table and stated "No, I mean like," then he stopped talking. After about forty-four seconds of silence, Landon stated that he should probably have a lawyer. Detective Hammerstrom let Landon know that the officers would apply for an arrest warrant and asked if he had any questions. He did not. The interview ended, and the officers escorted Landon to the lobby of the station.

37. Landon did not bring his phone with him to the interview at the Town of Groton Police Department. When Landon walked out to his vehicle, Investigator Nordstrom called his phone number. The officers then approached Landon, who was sitting in his truck, as he answered his cellular phone. On April 4, 2023, the officers seized TARGET DEVICE 1 from Landon at 12:11 p.m.

38.     On or about April 11, 2023, Victim 1 was interviewed at the New London Child Advocacy Center. Victim 1 confirmed that ▓▓▓▓▓▓▓▓▓▓▓▓▓ Victim 1 disclosed to the interviewer that a couple days after finding out about the bathroom camera (*i.e.*, on or about April 4, 2023), an alarm clock was the first thing that came to her and Witness 1's mind. Witness 1 then retrieved the alarm clock and discovered a camera lens with an SD card inserted in it. Victim 1 recalled the clock ▓▓▓▓▓▓▓▓▓▓▓▓ Victim 1 described the clock's location as being in the bathroom facing the shower. This angle would be consistent with the videos of Victim 1 posted on Wickr. Victim 1 said she believes Landon placed the spy camera alarm clock in the bathroom. Victim 1 told the interviewer, "I thin ▓▓▓▓▓ [the alarm clock]. I just don't know where [Witness 1] put it." Witness 1 never provided the alarm clock to law enforcement. As of today, the alarm clock has not been located.

39.     On or about April 14, 2023, a state search warrant was signed permitting the Town of Groton Police Department to examine TARGET DEVICE 1. The state warrant authorized the search of media data (*e.g.*, pictures, videos, chat applications) created, accessed, or modified for 30 days prior to the creation of the first child voyeurism video that Landon distributed—March 10, 2022—to the date officers seized the phone—April 4, 2023.

40.     On or about April 14, 2023, Detective Savino submitted TARGET DEVICE 1 to the Digital Forensics Laboratory at the Town of Groton Police Department. At the time, the forensic tool used to unlock and extract the data was unable to support the software version on the iPhone 13. On or about May 7, 2023, Detective Savino learned there was an update to the forensic tool and was able to connect TARGET DEVICE 1 to it for a digital extraction.

41.     On or about May 23, 2023, Victim 1 was interviewed a second time at the New London Child Advocacy Center. She did not make any additional disclosures regarding this investigation.

42.     On or about June 28, 2023, Town of Groton Police arrested Landon for several state offenses, including, but not limited to, first degree possession of child pornography. Landon did not post bond and has been held since his arrest.

43.     On or about July 7, 2023, Detective Savino requested that the Connecticut Department of Corrections ("DOC") conduct a phone and mail review for inmate Michael Landon. DOC assigned an Intelligence Officer to monitor Landon's phone calls and mail activity. Detective Hammerstrom exchanged emails with the Intelligence Officer who provided direct quotes from recorded phone conversations between Landon and Witness 1 that occurred between June 30, 2023, and July 18, 2023, in which they discussed TARGET DEVICE 2, a pink iPhone. Excerpts of these discussion are set forth below.

44.     On or about June 30, 2023, Landon asked Witness 1, "Have you gone over the Grand Fools?" Witness 1 responded, your [relative ("Witness 2")] went." Landon quickly noted, "Okay, I was gonna' mention that I'd done some laundry so check down in the basement. You know like I did do some laundry so make sure you go down there and check around the washing machine for any of my clothes that I might have left there." Landon explained that "you might have accidently left it in a hoodie or something. You know, so it might be down by the washing machine." Landon then provided Witness 1 with the passcode to unlock TARGET DEVICE 2. Based on Detective Savino's training, experience, this investigation, and the context of this call, he believed that Landon was asking Witness 1 to locate TARGET DEVICE 2.

45.     On or about July 9, 2023, Landon asked Witness 1, "Did you go over and pick up that phone that you left at the Grand Fools?" Witness 1 confirmed that she did. Landon asked if there was anything else with it. Witness 1 said, "I got it all taken care of."

46.     On or about July 11, 2023, at around 7:45 p.m., Landon and Witness 1 spoke again. Witness 1 told Landon that she finally opened TARGET DEVICE 2 the previous night and, after doing so, had to take an anxiety pill. The following conversation took place:

Landon:         "Find some things?"

Witness 1:      "Yup."

Landon:         "Yeah I know. Sorry. You know, I'm a screwed up person. Sorry, I ruined your life, you know? [Long Pause] ████████ [Crying] [Long Pause]."

Witness 1:      "[Crying] ████████. You disappointed me."

Landon:         "I'm disappointed in myself."

47.     On or about July 11, 2023, Witness 1 said she was looking to have notifications turned off on TARGET DEVICE 2. Witness 1 told him that he was getting notifications on what she described as a "chat thing." Landon told her it was "Telegram." Telegram is an encrypted text application where pictures and videos can be exchanged. Witness 1 also mentioned that Landon was getting notifications on YouTube and Snapchat. Later in the conversation, Witness 1 said that the only person she could talk to about all of this is Witness 2, and they are both on the same page. Witness 1 said she was going to give TARGET DEVICE 2 to Witness 2.

48.     On or about July 15, 2023, at 3:06 p.m., Landon and Witness 1 spoke. Witness 1 told Landon, "You know actually, I'm not actually super, super, super happy after I went snooping through your phone and I, you know, once again had to—and I just told [Witness 2] that I'm just gonna have to give her your phone, cuz I can't do it." Upon reviewing this call,

Groton detectives believed that TARGET DEVICE 2 contained either videos and/or images of evidentiary value and that Witness 1 was trying to distance herself from TARGET DEVICE 2. Due to the sensitive nature of the investigation and ease in which evidence of this kind can be erased from mobile devices, Groton detectives decided action was necessary to seize and preserve TARGET DEVICE 2.

49.     On or about July 18, 2023, at about 10:20 a.m., Detective Hammerstrom and Detective Comeau met with Witness 1 at ▮▮▮▮▮▮▮▮▮▮ o attempt to locate the pink iPhone, which is TARGET DEVICE 2. Detective Hammerstrom told Witness 1 that he had information about a pink iPhone (*i.e.*, TARGET DEVICE 2) that had some things on it that she had seen and that she didn't want to see. Witness 1 replied "Right." Detective Hammerstrom told Witness 1 that they were looking to see where the phone was. Witness 1 replied "Right." Detective Hammerstrom asked her what she did with the phone. Witness 1 replied "Um [pause] do you have a warrant?" At this point, the Groton detectives did not know the location of the phone in order to apply for a search warrant. Detective Hammerstrom said "No." He told Witness 1 that the phone had evidence on it. Witness 1 repeated, "warrant?" Detective Hammerstrom told Witness 1 that they needed to have it. Witness 1 replied "I don't think my lawyer would be," followed by a long pause. Detective Hammerstrom asked Witness 1 if she had TARGET DEVICE 2. Witness 1, after another long pause, stated "I will go get it." Witness 1 retrieved the iPhone and handed it to Detective Comeau.

50.     Witness 1 said that she did not know if there was anything on the pink iPhone, and she had been using it for passwords to pay bills. Detective Hammerstrom asked for the passcode to TARGET DEVICE 2, which Witness 1 provided. When Detective Hammerstrom asked Witness 1 if there was anything on there that after she saw it would require her to take an

anxiety pill, Witness 1 replied that she saw a notification from Snapchat that surprised her. She explained that it was a woman wearing an inappropriate pair of pants. After leaving the residence, Detective Comeau unlocked TARGET DEVICE 2 with the passcode Witness 1 provided and placed the iPhone in airplane mode to prevent it from being remotely manipulated. TARGET DEVICE 2 was entered into evidence.

51. On or about July 18, 2023, after the officers seized TARGET DEVICE 2, DOC's Intelligence Officer contacted Detective Savino. The Intelligence Officer told Detective Savino that Landon and Witness 1 had spoken with one another again. Landon asked about her day, and she replied, "It went very bad ████ and they know. I had two cops show up and the gentlemen used a phrase that I exactly word for word that I used with you." Landon asked about the presence of law enforcement. She answered, "To get something … It was something we had discussed." Witness 1 didn't specify what was taken, but she said, "I'm just – I'm scared. I am honestly scared."

52. On that same day, Landon also spoke with Witness 2. Witness 2 said, "So [Witness 1] has let me know that they took the pink phone. She texted me, they took the pink phone and so – and as we know these conversations are recorded and used by the investigator and she said that was proven today." Landon replied, "That's the one that had been set up for her so she could still pay bills and stuff." Witness 2 laughed and stated, "I know, so I hope that she – you know how she loves to have files (laughing) notebooks and all that."

53. On or about July 25, 2023, Detectives Savino and Hammerstrom went to New London Superior Court, 70 Huntington Street, New London, CT, to apply for a search and seizure warrant for electronically stored, non-privileged, telephone and e-message communications, to include the DOC incident report and call notes, from June 30, 2023, up to

and including July 18, 2023, of inmate Michael Landon (Inmate #443690) who is incarcerated at Corrigan-Radgowski Correctional Center in Uncasville, CT, stored at State of Connecticut Department of Corrections Headquarters Security Division in Wethersfield, CT. On or about July 24, 2023, a Connecticut state judge signed the warrant. Detective Hammerstrom sent a copy to the DOC Intelligence Officer.

54.     On or about July 27, 2023, Detective Hammerstrom went to DOC Headquarters in Wethersfield, CT, and met with DOC Intelligence Officer Meehan. Officer Meehan provided a copy of the records summary report and two Intelligence Unit Physical Evidence Tag and Chain of Custody forms for Landon (one for the prison calls and one for the e-messages) and two discs (one containing Landon's prison calls and the other containing Landon's e-messages). The discs and records were entered into evidence. Detective Hammerstrom verified the information previously provided by the DOC Intelligence Officer.

55.     Based on the training and law enforcement experience of the Groton Detectives into Preferential Sexual Offenders, along with the recorded phone conversations between Landon and Witness 1, Detectives Hammerstrom and Savino believed that the pink iPhone 7 contained media and/or data related to chat applications that could further support that Landon possessed, manufactured, and/or distributed files containing child pornography on TARGET DEVICE 2.

56.     On or about August 3, 2023, Detectives Hammerstrom and Savino applied for a Search and Seizure Warrant for TARGET DEVICE 2. That same day, a Connecticut Superior Court judge signed the warrant. TARGET DEVICE 2 is currently stored in evidence at the Town of Police Department Forensics Laboratory.[3]

---

[3] Town of Groton Police Department Detective Savino examined TARGET DEVICES 1 and 2 pursuant to the state-issued search warrants described above. This Affidavit establishes probable cause to search those devices without relying on any information contained on either of the TARGET DEVICES. Out of an abundance of caution,

## TRAINING AND EXPERIENCE RE: CHILD PORNOGRAPHY OFFENDERS

57.     Based upon my knowledge, experience, and training in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the distribution and possession of child pornography:

a.     The majority of individuals who distribute and/or collect child pornography and/or sexually explicit materials of minors receive sexual gratification, stimulation, and satisfaction from viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b.     The majority of those individuals collect and/or share sexually explicit or suggestive materials with other like-minded individuals, either in person or over the Internet. Such individuals oftentimes use these materials for their own sexual arousal and gratification.

c.     Those individuals often maintain their collections in a digital or electronic format in a safe, secure, and private environment, such as on computers, cellular phones, and electronic storage devices.

d.     Those individuals may correspond with and/or meet others to share information and materials; conceal such correspondence as they do their sexually explicit material; and maintain the contact information for individuals with whom they have been in contact and who share the same interests in child pornography.

e.     Those individuals often utilize social media platforms to share sexually explicit material and communicate with others who are interested in the sexual exploitation of minors. Social media platforms allow users to interact with each other in a quick and (seemingly) anonymous fashion.

---

however, I am disclosing to this Court that the Town of Groton Police Department investigators have reported that they did not find images depicting the sexual abuse of minors on TARGET DEVICE 2. Nevertheless, based on the information contained in this Affidavit, there is probable cause to believe, at a minimum, that the other evidence described in Attachment B will be found on TARGET DEVICE 2.

## CONCLUSION

58.    Based on my training and experience and the facts set forth in this Affidavit, there is probable cause to believe, and I do believe, that contraband, evidence, fruits, and instrumentalities of the TARGET OFFENSES, as more fully described in Attachment B, will be found on the TARGET DEVICES, which are more fully described in Attachment A.

Respectfully submitted,

THOMAS KAPP
Digitally signed by THOMAS KAPP
Date: 2023.12.20 11:31:03 -05'00'

THOMAS L. KAPP
Special Agent, FBI

Attested to me by telephonic communication on this 20th day of December 2023 by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Maria E. Garcia
Digitally signed by Maria E. Garcia
Date: 2023.12.20 12:59:14 -05'00'

MARIA E. GARCIA
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**
**DESCRIPTION OF ITEMS TO BE SEARCHED**


The property to be searched are the following Apple iPhones (collectively, the "TARGET

DEVICES"):

1. Blue Apple iPhone 13, serial number J26KYTR666 ("TARGET DEVICE 1"); and

2. Pink Apple iPhone 7 Plus, serial number F2LT56TKHG07 ("TARGET DEVICE 2")

Both of the TARGET DEVICES are presently in the custody of the Town of Groton Police

Department located at 68 Groton Long Point Road in Groton, Connecticut.

**ATTACHMENT B**
**ITEMS TO BE SEIZED**

All materials that constitute contraband, evidence, fruits, and/or instrumentalities of producing child pornography, in violation of 18 U.S.C. § 2251, distributing child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2) and (b)(1), as well as possessing and accessing with intent to view child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) (collectively, the "TARGET OFFENSES"), for the time period from March 30, 2022, to April 2, 2023, including, but not limited to, the following:

1. The TARGET DEVICES;

2. All software, including programs to run operating systems, applications, utilities, compilers, interpreters, and communications programs, including, but not limited to, camera software, software to record, playback, or display pictures, images, videos, movies, and communication and file transfer applications;

3. All photographs, images, and videos, in any format, including any associated metadata or EXIF information, depicting child pornography, as defined in 18 U.S.C. § 2256;

4. Records of Internet activity, including logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses related to the TARGET OFFENSES;

5. Records of Internet Protocol addresses used;

6. Communications related to the TARGET OFFENSES;

7. Names, addresses, contact information or lists of names, addresses or contact information, in any format, of those who may have been contacted in connection with the TARGET OFFENSES.

8. Records, documents, communications, correspondence, invoices and materials, in any format, that concern any accounts with Wickr, Telegraph, YouTube, Snapchat, or with any Internet Service Provider.

9. Photographs or videos of any minors who may have been contacted in connection with the TARGET OFFENSES.

10.     Evidence of who used, accessed, owned, or controlled the TARGET DEVICES;

11.     Evidence of software that would allow others to control the TARGET DEVICES, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

12.     Evidence of the lack of such malicious software;

13.     Evidence indicating how and when the TARGET DEVICES were accessed or used, and evidence indicating the geographic location of the TARGET DEVICES when they were accessed or used;

14.     Evidence indicating the state of mind of the TARGET DEVICES' user as it relates to the crimes under investigation;

15.     Evidence of the attachment to the TARGET DEVICES of other devices or similar containers for electronic evidence;

16.     Evidence of counter-forensic programs; and

17.     Passwords and encryption keys, and other access information that may be necessary to access the TARGET DEVICES.

As used above, the terms "records" and "information" include all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, network hardware, and digital cameras. The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, floppy disks, compact discs,

magnetic tapes, memory cards, memory chips, and other magnetic or optical media.

Pursuant to Rule 41(e)(2)(B), it is authorized that electronically stored information may be imaged or copied. With respect to a DEVICE containing electronically stored information, consistent with Rule 41(e)(2)(B), the warrant is deemed executed once the TARGET DEVICE has been physically seized or copied on-site, and that review of the contents of the TARGET DEVICE is permitted at a later time.